Filed 6/10/21  P. v. Wade CA2/4

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>GERALD CURTIS WADE,<br><br>    Defendant and Appellant. | B298456<br><br>(Los Angeles County<br>Super. Ct. No. TA146856) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Sean D. Coen, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Patrick J. Hoynoski, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill and Nima

Razfar, Deputy Attorneys General, for Plaintiff and
Respondent.

_____

## INTRODUCTION

Appellant Gerald Curtis Wade was charged with two
counts of violating Penal Code section 422 (making a
criminal threat) for threatening to kill Michael Chatman and
Raymond Rash, managers of the property where he lived.[1]
At appellant's request, he was initially permitted to
represent himself.  However, the right was subsequently
revoked, based on his conduct during the preliminary
hearing.  During trial, appellant requested the court instruct
the jury on self-defense.  The court refused, finding the
instruction inapplicable to the charges.  The jury found
appellant guilty, and he was sentenced to a total of 10 years
and four months in prison, including a five-year
enhancement pursuant to section 667, subdivision (a)(1), and
a one-year enhancement pursuant to section 667.5 (stayed),
both based on the same prior conviction.

On appeal, appellant argues the court erred in:  (a)
refusing to instruct the jury on self-defense; (b) terminating
appellant's self-representation; and (c) imposing two
sentence enhancements based on the same prior conviction.
The People counter that:  (a) even if self-defense were

_____

[1]     Undesignated references are to the Penal Code.

2

applicable to criminal threats, substantial evidence did not support the giving of the instruction; and (b) the court correctly terminated appellant's self-representation when he proved unduly disruptive. The People concede the court erred in imposing two sentence enhancements based on the same prior conviction. We agree the court improperly imposed two sentence enhancements, but otherwise discern no error. We therefore remand the matter to the court with instructions to strike the one-year sentence enhancement, and otherwise affirm the judgment.

## STATEMENT OF RELEVANT FACTS

### A. *Appellant Asserts, Then Loses, the Right to Self-Representation*

In August 2018, appellant, upon receiving a notice to vacate the room he occupied at a transitional housing site, allegedly threatened to kill Chatman and Rash -- both assistant managers -- and engaged in a physical altercation with Chatman, who thereafter called the police. A felony complaint was filed against appellant, charging him with two counts of violating section 422, subdivision (a).[2]

---

[2] (Pen. Code, § 422, subd. (a) ["Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person
*(Fn. is continued on the next page.)*

On September 4, 2018, appellant appeared for a preliminary hearing, and requested to represent himself; after providing appellant with a *Faretta* waiver and reviewing it with him, the court (Wallenstein, J.) granted his request.[3] As part of the waiver, appellant acknowledged that he "must not disrespect or abuse the dignity of the Court" and that "the Judge may terminate my right to act as my own attorney in the event that I engage in serious misconduct, refuse to come to court or obstruct the conduct and progress of the trial."

Appellant was unprepared to proceed with the preliminary hearing on that day and at future hearings, and the court granted him several continuances. At two hearings in November 2018, appellant behaved in a disrespectful and disruptive manner. At a November 9 hearing, appellant

---

threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety, shall be punished by imprisonment in the county jail not to exceed one year, or by imprisonment in the state prison"].)

[3] "As established by the high court in *Faretta* [*v. California* (1975) 422 U.S. 806], a defendant has a federal constitutional right to the assistance of counsel during all critical stages of a criminal prosecution. [Citations.] A defendant may nonetheless waive this right and personally represent himself or herself, as long as the defendant's waiver of the right to counsel is valid. . . . If a defendant validly waives the right to counsel, a trial court must grant the request for self-representation." (*People v. Daniels* (2017) 3 Cal.5th 961, 977-978.)

4

interrupted the court (Olson, J.) at least six times and accused the court of violating his due process rights. He repeatedly argued that the criminal complaint filed against him must be signed, even after the court advised him that any request for relief should be made in the form of a motion. At the November 28 preliminary hearing, appellant interrupted the court (Lonergan, J.) several times, and was admonished. Appellant admitted he had a "habit" of interrupting. After the fourth such interruption, the court warned appellant: "[I]f you continue to disrupt the court, I will stop the proceedings and provide you an attorney." Appellant then stated he had two motions to file and was "asking to put in my two documents. Then I'll be quiet." The court accepted the motions and instructed the People to call their first witness. Appellant immediately interrupted and asked to be removed from the courtroom. When asked if he still wished to represent himself, appellant responded that he did, but that he objected to the hearing because it violated his rights. As the court attempted to permit the People to proceed, appellant continued to interrupt, insisting he be removed from the courtroom, while accusing the court of violating his rights. After appellant had interrupted at least 12 times from the time the hearing began, the court appointed Glen Kiyohara as his counsel.[4] Appellant was then removed, and the preliminary hearing proceeded without him. After the hearing concluded and appellant had

---

[4] Kiyohara had been appointed as "standby counsel."

been held to answer, the court noted that it had appointed Kiyohara as counsel "based on Mr. Wade's attempt to obstruct the proceedings, his refusal to participate and his continued interruptions of this court."[5]

In December 2018, the People filed an information, charging appellant with two counts of violating section 422, subdivision (a). Each count included enhancement allegations under sections 667.5, subdivision (b), 1170.12, and 667, subdivision (a)(1).

## B. *Trial*

Trial commenced in April 2019. Four witnesses testified. The relevant portions of their testimony are summarized below:

### 1. The Prosecution Case
#### (a) Michael Chatman

Chatman testified that he and Rash were the managers of the property where appellant was living, which consisted of three houses and a patio area. The residents were assigned to rooms in the houses and had agreed to abide by certain rules. Chatman lived in one of the three houses, and appellant lived in another. On the day of the incident, based on appellant's failure to abide by the

---

[5] Judge Lonergan also remarked that he had spoken with a previous judge who had indicated there was an incident in which the court was unable to bring appellant into the courtroom, but clarified that he was "not sure what happened there . . . ."

6

residency rules, a notice to vacate was placed on the door of his room.[6]

Chatman came out of his residence and saw Rash and appellant in the patio area. Appellant was walking toward him in a rage, yelling, "you thought you threw me under the bus. You motherfuckers." Appellant also said, "I am going to kill you motherfuckers." Chatman responded that appellant was responsible for his own eviction. As Chatman approached the patio, appellant continued to rage that he was going to "kill you . . . because y'all try to put me under the bus . . . ." When Chatman reached the patio, he sat down. Appellant, now directing his comments to both Chatman and Rash, stated, "I'll have all of you motherfuckers killed in here." He then approached Chatman and started reaching toward his rear waistband area, causing Chatman, who knew appellant had knives, to fear for his safety. Appellant swung at Chatman with his fist, but missed. Appellant continued to threaten Chatman, but eventually appellant stepped back, and Chatman stood up.

Appellant then stated he wanted his things, and Chatman agreed to accompany him to his residence to retrieve them. Appellant, seeing the eviction notice again, flew into a rage and rushed Chatman while reaching again toward his waistband and threatening to kill him. Chatman

---

[6]     Rash testified that it was he who placed the notice on the door of appellant's room.

believed appellant had a weapon, and began "swinging for my life because I didn't want him to get whatever he was reaching for. . . . [¶] . . . [¶] I was determined not to let whatever he was reaching for come out." Chatman admitted he "kept swinging as hard as I could." The two started fighting; when Chatman believed appellant was no longer able to fight back, and heard appellant's girlfriend Jeannette White say, "that's enough," he backed off. However, appellant again rushed Chatman, threatening to kill him, and the fight resumed. Chatman "g[o]t the best of" appellant, and appellant ended up on the ground; Chatman then ran out of the house and called 911. Though hit by appellant, Chatman did not seek medical treatment.

### (b)  Raymond Rash

Rash testified that he was sitting in the patio area when he saw appellant enter the house where appellant resided, and where Rash had placed a notice requiring appellant to vacate on the door to his room. Appellant entered the residence, cursed, exited, and angrily confronted Rash, stating, "I'm going to get you, you motherfucker." As appellant walked toward Rash, he reached toward the small of his back, repeating the threat, this time including Chatman: "You pussy motherfucker, I'm going to kill you and Michael Chatman." Appellant then asked, "Where is that motherfucker, Michael Chatman? I'm going to kill him." During this time, Chatman was walking toward Rash and appellant, and appellant walked off the patio, enraged,

8

stating he would kill Chatman.  When Chatman and appellant both returned to the patio, Chatman attempted to explain to appellant that his own actions had precipitated the situation.  Appellant responded by trying to hit Chatman, and Chatman blocked the blow.  The pair then went to appellant's residence.  Appellant was "highly aggressive" with Chatman and threw the first punch; Chatman defended himself.  Appellant continued to scream at Chatman, and threaten to kill everyone.  On cross-examination, Rash testified to seeing Chatman straddle appellant and hit him, with the blows having "the desired effects."

### 2.    The Defense Case
### (a)    Jeannette White

White lived in the same house as appellant, and had been romantically involved with him.  She stated that while sitting in the living room, she "just saw [appellant and Chatman] were talking, and then all of a sudden they started like -- there was just fists hitting back and forth." White had been watching something on her phone, and initially did nothing.  But, when the fighting persisted, she asked Chatman to stop because appellant was on the ground, and Chatman was straddling him and hitting him. She saw Chatman hit appellant approximately six times, hard, and appellant seemed "like he was kind of like going out . . . [¶] . . . [¶] [in] a daze," from the punches.

On cross-examination, White testified she had been watching something on her phone when the fight in the house began, and was distracted, but reacted "when I noticed they w[ere] hitting each other . . . ." She "didn't see who hit first," but Chatman and appellant "were hitting" and appellant was "defending hi[m]self. He was on the floor when I intervened." She then testified that appellant did not strike Chatman.

### (b)   Deputy Joshua Hernandez

Los Angeles County Sheriff's Deputy Hernandez was one of the deputies who responded to the incident. He interviewed Chatman and Rash, and summarized their statements in a report.

Deputy Hernandez testified that Rash told him appellant tried to hit Chatman on the patio, and later on, the two got into a physical fight. He stated Rash did not tell him appellant had threatened to kill everyone until after Rash told him about the physical fight. The deputy also testified that Chatman told him that after appellant tried to hit him on the patio, Chatman dodged that punch and struck appellant twice in the face in self-defense. Chatman told Hernandez that appellant then reached for his waistband, and fearing he had a weapon, Chatman struck him once more and stated he would call 911. It was only then that Chatman reported appellant had threatened to kill everyone. Deputy Hernandez testified he found no weapons on appellant.

On cross-examination, the deputy testified his report was a summary of what he was told, and that he found both Chatman and Rash credible and consistent. He testified it was possible Chatman had reported that appellant's threats were made before the fight.

## C. *Jury Instructions and Closing Arguments*

After the conclusion of testimony from the witnesses, appellant asked the court (Coen, J.) to instruct the jury on self-defense, specifically CALJIC Nos. 5.30,[7] 5.50,[8] and 5.51.[9]

---

[7]     (CALJIC No. 5.30 ["It is lawful for a person who is being assaulted to defend . . . himself . . . from attack if, as a reasonable person, . . . he . . . has grounds for believing and does believe that bodily injury is about to be inflicted upon . . . him . . . .  In doing so, that person may use all force and means which . . . he . . . believes to be reasonably necessary and which would appear to a reasonable person, in the same or similar circumstances, to be necessary to prevent the injury which appears to be imminent"].)

[8]     (CALJIC No. 5.50 ["A person threatened with an attack that justifies the exercise of the right of self-defense need not retreat.  In the exercise of . . . his . . . right of self-defense a person may stand . . . his . . . ground and defend . . . himself . . . by the use of all force and means which would appear to be necessary to a reasonable person in a similar situation and with similar knowledge . . . .  This law applies even though the assailed person might more easily have gained safety by flight or by withdrawing from the scene"].)

[9]     (CALJIC No. 5.51 ["Actual danger is not necessary to justify self-defense.  If one is confronted by the appearance of danger which arouses in . . . his . . . mind, as a reasonable person, an actual belief and fear that . . . he . . . is about to suffer bodily
(*Fn. is continued on the next page.*)

11

The court responded that it did not think the instructions applied "in this case because the defendant is not charged with any sort of assault, [or] assaultive behavior. So, in other words, they would have to believe . . . that the defendant exercised force that was reasonably necessary, but that reasonably necessary force is not threats. So it just doesn't seem like it would equate to what the defendant is charged with." Appellant countered that, in self-defense, a person "may use all force and means which he believes to be reasonable necessary," and "it's our position that he used threats against the assault," and that "threats" fell within the "means" permitted in self-defense. The court, characterizing the argument as a "stretch," commented: "Again, if the defendant was charged with some sort of assaultive behavior, whether it be a 245 [assault with a deadly weapon] or attempted murder, what have you, then I think there would be substantial evidence warranting the giving of these instructions thus far. But with these charges, I don't . . . believe that it equates to that and that's why I won't give those instructions."

The next court day, appellant elected not to testify, and the parties stipulated to the admission of a medical

---

injury, and if a reasonable person in a like situation, seeing and knowing the same facts, would be justified in believing . . . himself . . . in like danger, and if that individual so confronted acts in self-defense upon these appearances and from that fear and actual beliefs, the person's right of self-defense is the same whether the danger is real or merely apparent"].)

document attesting that appellant had received a diagnosis of "a closed head injury, a jaw strain, a nasal fracture, and scalp laceration . . . ."

## D.    *Verdict and Sentencing*

The jury found appellant guilty on both counts.  In mid-May, the court held a trial on the prior convictions and found appellant previously had been convicted of a serious and violent felony.  The court sentenced appellant to a total of 10 years and four months in prison, consisting of:  (1) two years for count 1, doubled to four years due to sections 667 and 1170.12; (2) eight months for count 2, doubled to 16 months due to sections 667 and 1170.12; and (3) an additional five years under section 667(a)(1).  The court also imposed and stayed an additional one-year enhancement pursuant to section 667.5.  Appellant timely appealed.

## DISCUSSION
## A.    *The Court Did Not Err in Refusing to Instruct on Self-Defense*

The court declined appellant's request to instruct the jury on self-defense, opining this defense was inapplicable. It stated that "if the defendant was charged with some sort of assaultive behavior, whether it be a 245 [assault with a deadly weapon] or attempted murder, what have you, then I think there would be substantial evidence warranting the giving of these instructions thus far.  But with these charges,

I don't . . . believe that it equates to that and that's why I won't give those instructions."

On appeal, appellant argues self-defense is a viable defense to the charge of making a criminal threat. He additionally argues that substantial evidence supported the giving of a self-defense instruction, and the refusal to give such an instruction was not harmless. We need not decide whether self-defense is a viable defense to the charge of making a criminal threat because substantial evidence did not support the giving of a self-defense instruction, and any error in failing to give the instruction would have been harmless.

## 1. Substantial Evidence Did Not Support a Self-Defense Instruction

It is undisputed that a court "'should instruct the jury on every theory of the case, but only to the extent each is supported by substantial evidence.'" (*People v. Flannel* (1979) 25 Cal.3d 668, 685 (*Flannel*); see also *Mathews v. United States* (1988) 485 U.S. 58, 63 ["a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor"]). "If the evidence should prove minimal and insubstantial, however, the court need not instruct on its effect." (*Flannel, supra*, at 684.) The trial court found that substantial evidence would have warranted a self-defense instruction were such an instruction applicable to criminal threats. However, "[o]n appeal, we independently review the

14

court's refusal to instruct on a defense." (*People v. Orlosky* (2015) 233 Cal.App.4th 257, 270.) "A 'ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason. If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion. [¶] . . . [¶] In other words, it is judicial action, and not judicial reasoning or argument, which is the subject of review; and, if the former be correct, we are not concerned with the faults of the latter.'" (*People v. Dawkins* (2014) 230 Cal.App.4th 991, 1004.) Thus, we independently determine whether substantial evidence supported a self-defense instruction. We find that substantial evidence did not support findings that: (a) appellant's threats were made in self-defense; (b) Chatman was the aggressor; or (c) appellant regained any right to self-defense thereafter.

> **(a) No Evidence Supported a Finding That Any Threats Occurred Only During the Fight**

In requesting instructions on self-defense, appellant's counsel posited that the jury might have found appellant uttered his threats only in the course of his physical altercations with Chatman, and did so as a reasonable response to the blows Chatman was inflicting. The evidence did not support such a finding.

15

Both Chatman and Rash testified unequivocally that appellant's threats were made almost upon sight -- well before any physical altercation occurred. Both victims testified that appellant was infuriated by the notice to vacate and upon seeing them, hurled a mixture of threats and insults at both men. Both victims also testified that appellant was the one who initiated the physical altercations with Chatman, and Chatman was defending himself. Their testimony was uncontradicted by any percipient witness.[10] The only reasonable conclusion from this evidence is that appellant began threatening the victims before any physical altercation began.

Appellant argues that because both victims did not tell Deputy Hernandez about the threats until after they told him about appellant's physical assaults, this is "substantial evidence to support that appellant only made the threats *after* the physical altercation began." We disagree. The order in which the victims related events to Deputy Hernandez is, at best, minimal and insubstantial evidence as to the order the events actually occurred. Nothing in the record suggests the victims' statements were in strict chronological order. Moreover, Deputy Hernandez testified that what was contained in his report was only a summary of what the victims had told him, and confirmed that Chatman might have told him the threats were made before

---

[10]    White acknowledged having seen only a portion of the physical altercation inside the house and did not claim to have seen appellant or Chatman before they entered the house.

the fight began. On this record, we find no substantial evidence supported a finding that appellant made his threats only after the physical altercation began. Accordingly, substantial evidence did not support instructing the jury on self-defense.[11]

### (b) Substantial Evidence Did Not Support Finding That Chatman Was the Aggressor

"It is well established that the ordinary self-defense doctrine . . . may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified." (*In re Christian S.* (1994) 7 Cal.4th 768, 773, fn. 1.) Even had substantial evidence supported a finding that appellant made his threats as a reaction to Chatman's striking him, Chatman's attack was legally justified as a defense to appellant's assault, foreclosing appellant from claiming self-defense.

The evidence did not support a conclusion that Chatman was the aggressor in the altercations with

---

[11] To the extent Hernandez's testimony can be read to suggest Rash told him appellant uttered a particular threat "after the physical confrontation," this does not assist appellant. It does not contradict Rash's testimony that appellant made multiple threats to kill him and Chatman before assaulting Chatman. Nor would a threat made after the fight have been justified by self-defense.

17

appellant. Chatman testified that: (1) appellant swung at him and missed while they were on the patio; (2) appellant rushed him after they had both gone to appellant's room and appellant saw the eviction notice on the door again; and (3) after Chatman stopped striking appellant, believing he could no longer fight, appellant rushed him again, causing the fight to resume. Rash testified that: (1) appellant swung at Chatman on the patio, but Chatman blocked the blow; and (2) at appellant's residence, appellant was "highly aggressive" with Chatman and punched him, while Chatman defended himself. Finally, Deputy Hernandez testified that Rash told him appellant tried to hit Chatman on the patio, and later on, the two got into a physical fight. The deputy also testified that Chatman reported that appellant had tried to hit him on the patio, and that Chatman had dodged and struck appellant twice in self-defense.[12] In short, the uncontradicted evidence established that appellant was the aggressor, and Chatman fought back to defend himself. On this record, appellant had no claim of self-defense. (*In re Christian S.*, *supra*, 7 Cal.4th at 773, fn. 1.)

Citing *People v. Frandsen* (2011) 196 Cal.App.4th 266 for the proposition that "the defendant has a right to defend

---

[12]    White admitted she did not see how the fight began, and that she "didn't see who hit first." She confirmed that Chatman and appellant "were hitting" and that "there was just fists hitting back and forth." Her later self-contradictory testimony that appellant did not hit Chatman was not substantial evidence that Chatman was the aggressor.

himself, 'even when the defendant set in motion the chain of events that led the victim to attack the defendant,'" appellant argues that he was entitled to defend himself "even if appellant's own actions prompted Mr. Cha[t]man to attack him."  Appellant misinterprets *Frandsen*.  There, the court held that "'the defense [of self-defense] is available when the victim's use of force against the defendant is unlawful, even when the defendant set in motion the chain of events that led the victim to attack the defendant.'" (*Id.* at 274.)  In other words, "[o]nly when the victim resorts to *unlawful* force does the defendant-aggressor regain the right of self-defense." (*Id.* at 273.)  But "'a defendant who— through his own wrongful conduct, such as initiating a physical assault or committing a felony—has created circumstances under which his adversary's attack or pursuit is legally justified may not invoke self-defense.'" (*Ibid.*, citing *People v. Szadziewicz* (2008) 161 Cal.App.4th 823, 833-834.)  Absent evidence that in the course of the altercation initiated by appellant, Chatman engaged in unlawful force -- a proposition we expressly reject below -- appellant had no right to invoke the doctrine of self-defense.

### (c)   Appellant Did Not Regain His Right to Self-Defense

In his reply brief, citing *People v. Quach* (2004) 116 Cal.App.4th 294 (*Quach*), appellant argues he regained his right to self-defense "because the evidence shows that Mr. Cha[t]man used excessive force." (*Id.* at 301 ["'Where the

19

original aggressor is not guilty of a deadly attack, but of a simple assault or trespass, the victim has no right to use deadly or other excessive force. . . . If the victim uses such force, the aggressor's right of self-defense arises'"].) Black's Law Dictionary defines "excessive force" as "[u]nreasonable or unnecessary force under the circumstances." (Black's Law Dict. (11th ed. 2019).) Substantial evidence does not support a finding that Chatman's response was unreasonable or unnecessary.

Appellant suggests Chatman used excessive force because he "kept attacking even after he had gotten the better of appellant," because Chatman was "'swinging as hard as he could,'" because appellant appeared to be "'in a daze'" from Chatman's punches, because appellant suffered documented injuries while Chatman did not, and because appellant was unarmed. None of this constitutes evidence of excessive force.

Chatman testified he struck appellant after appellant rushed him and threatened to kill him. Chatman further testified appellant reached for his back as he did so, leading Chatman, who had seen appellant carrying knives, to believe he had a weapon. Chatman testified he was "swinging for my life because I didn't want him to get whatever he was reaching for. . . . [¶] . . . [¶] I was determined not to let whatever he was reaching for come out." While no weapon was ever found on appellant, nothing suggests Chatman's fear that appellant had a weapon was unreasonable. The fact that Chatman "got[] the better of appellant," that

20

appellant suffered injuries, or that appellant appeared to be dazed at some point in the fight, is evidence only that Chatman was, in this instance, a more proficient pugilist, not that anything he did was unnecessary or unreasonable under the circumstances.  Appellant cites no authority to the contrary.[13]  Because Chatman's response to appellant's actions was not excessive, appellant never regained any right to self-defense.

### 2.    Any Error Would Have Been Harmless

Appellant argues that because the failure to instruct on self-defense "deprived appellant of his due process right to present a complete defense . . . the error must be assessed under the *Chapman* standard of prejudice, requiring respondent to prove the error harmless beyond a reasonable

---

[13]    In the sole case appellant does cite, *Quach*, the court reversed an attempted murder conviction when it found a jury instruction on self-defense for mutual combatants erroneously stated the law, in part because it failed to mention that an aggressor could regain his right to self-defense if the victim unreasonably responded with deadly or other excessive force. (*Quach*, *supra*, 116 Cal.App.4th at 301.)  The evidence at trial supported a finding that, after the defendant's efforts at calming a rival gang member had failed, the gang member shot at the defendant who then returned fire.  (*Id.* at 297-298.)  Here, Chatman did not escalate the amount or type of force used -- he defended himself against appellant's fists using his own, and inflicted injuries consistent with a fistfight.  The fact that Chatman may have landed more blows does not render his response excessive.

21

doubt" rather than the *Watson* standard, which requires reversal only "if it is 'reasonably probable' that appellant would have received a more favorable outcome had the error not occurred." However, appellant argues that we need not separately analyze these standards, as reversal is required even under the *Watson* standard. We disagree that reversal is required.

If the court had given appellant's requested instructions, the jury would have been required to find, at a minimum, that appellant threatened Chatman and Rash only while engaged in a physical altercation with Chatman, and not before. (CALJIC No. 5.30.) As discussed above, no evidence supported a finding that appellant's threats were made only during the altercation, and there was uncontradicted evidence they were made before. Moreover, there was no evidence as to when any threat allegedly made during the altercation with Chatman occurred. Accordingly, the jury could not have determined it was made after appellant, the aggressor, could have reacquired a right to self-defense. In short, even had the requested instructions been given, we find no possibility appellant would have obtained a more favorable result.

## B.     *The Court Did Not Err in Terminating Appellant's Self-Representation*

When the court (Wallenstein, J.) granted appellant's request to represent himself, appellant acknowledged that he "must not disrespect or abuse the dignity of the Court"

22

and that "the Judge may terminate my right to act as my own attorney in the event that I engage in serious misconduct, refuse to come to court or obstruct the conduct and progress of the trial."  As noted, on more than one occasion, appellant repeatedly interrupted the judges presiding over the proceedings and accused them of misconduct.  At the preliminary hearing, the court (Lonergan, J.) appointed Kiyohara as appellant's counsel, thereby revoking appellant's right to represent himself.  Appellant argues this was an abuse of discretion because "the record fails to establish that [appellant] engaged in a pattern of misconduct that threatened the core integrity of the trial" and that there were only "two occasions where appellant became frustrated due to a misunderstanding with the court."

Appellant's right to self-representation "'is not a license to abuse the dignity of the courtroom.  Neither is it a license not to comply with relevant rules of procedural and substantive law.'" (*People v. Welch* (1999) 20 Cal.4th 701, 734.)  The right may be exercised only if the defendant "'is able and willing to abide by rules of procedure and courtroom protocol.'" (*Ibid*., italics omitted.)  "This rule is obviously critical to the viable functioning of the courtroom.  A constantly disruptive defendant who represents himself, and who therefore cannot be removed from the trial proceedings as a sanction against disruption, would have the capacity to bring his trial to a standstill." (*Ibid*.)  "Thus, a trial court must undertake the task of deciding whether a

defendant is and will remain so disruptive, obstreperous, disobedient, disrespectful or obstructionist in his or her actions or words as to preclude the exercise of the right to self-representation. The trial court possesses much discretion when it comes to terminating a defendant's right to self-representation and the exercise of that discretion 'will not be disturbed in the absence of a strong showing of clear abuse.'" (*Id.* at 735.)

In the proceedings below, appellant behaved in a disruptive and disrespectful manner. During one hearing, appellant interrupted the court (Olson, J.) several times, accused the court of misconduct, and argued with the court regarding the need for his criminal complaint to be signed, even after being told the proper way to bring an issue to the court was by filing a motion. Again, at the preliminary hearing, appellant disrupted the proceedings at least 12 times, once even admitting he had a "habit" of interrupting. After the fourth interruption, the court (Lonergan, J.) admonished appellant that if he continued to disrupt the proceedings, the court would appoint standby counsel Kiyohara as appellant's attorney. Despite this warning, appellant interrupted the proceedings at least eight more times. On this record, we find the court was well within its discretion to terminate appellant's self-representation.[14]

---

[14] Appellant also argues the court erroneously relied on an alleged previous disruptive incident with a different judge that had not actually occurred. While it is unclear what incident the court was referring to, the court did not base its revocation
(*Fn. is continued on the next page.*)

**C.** *The Court Erred in Imposing a Second Sentence Enhancement Based on the Same Prior Conviction*

After finding beyond a reasonable doubt that appellant had previously been convicted of a serious and violent felony, the court enhanced appellant's sentence by five years under section 667, subdivision (a)(1), and then again by an additional year pursuant to section 667.5; the second enhancement was stayed. Appellant argues the court could not impose both enhancements based on the same prior conviction and requests we strike the enhancement under section 667.5. The People agree. "[W]hen multiple statutory enhancement provisions are available for the same prior offense, one of which is a section 667 enhancement, the greatest enhancement, but only that one, will apply." (*People v. Jones* (1993) 5 Cal.4th 1142, 1150, 1152, 1153 [concluding court erred in imposing enhancements under both sections 667 and 667.5 based on same prior offense and "remand[ing] to the trial court with directions to strike the one-year enhancement of defendant's sentence for his prior offense of kidnapping under subdivision (b) of section 667.5"].) The court erred in enhancing the sentence under

_____

decision on this alleged incident, but on appellant's "attempt to obstruct the proceedings," "refusal to participate[,] and his continued interruptions of this court." Appellant additionally argues he was able to abide by the court rules in other instances, but fails to explain how those instances would negate the disruptions he caused at the preliminary hearing.

section 667.5 when it had already enhanced it under section 667.

## DISPOSITION

The matter is remanded to the trial court with directions to strike the one-year sentence enhancement imposed pursuant to section 667.5, and to issue an amended abstract of judgment and forward it to the California Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

MANELLA, P. J.

We concur:

WILLHITE, J.

CURREY, J.

26